IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLES RAYMOND NOEL <u>et al.</u>      :
                                       :
v.                                     :   Civil No. WMN-06-2069
                                       :
OFFICER CARLOS ARTSON <u>et al.</u>    :


<u>**MEMORANDUM**</u>

Before the Court is Defendants' Motion for Summary Judgment.
Paper No. 25  The motion is ripe.  Upon review of the pleadings
and the applicable case law, the Court determines that no hearing
is necessary (Local Rule 105.6) and that the motion must be
denied.

## I. FACTUAL BACKGROUND

This case arises from the fatal shooting of Cheryl Lynn
Noel, in her bedroom, in the early morning hours of January 21,
2005, by Baltimore County Police Officer Carlos Artson.  While
there are minor disputes of fact as to some of the details, the
parties generally agree on the basic sequence of events that led
to Ms. Noel's untimely death.

Cheryl Noel resided with her husband, Charles Noel, and her
son, Matthew Noel, in a small row home in Dundalk, Maryland.  On
the date of her death, Cheryl was 45 years old, and Charles was
52 years old.  Both Cheryl and Charles were gainfully employed.
Charles had been employed by the Department of Defense at Fort
Meade for more than 10 years and, on the morning in question,
arrived home around 1:00 a.m. after working a 4:00 p.m. to

midnight shift.  Matthew was 20 years old at the time and his
bedroom was in the basement of the two story row home.  The Noels
had another son, Plaintiff Jacob Noel, then age 22, who had moved
out of the family home three or four months before the events of
January 21, 2005.

In late October 2004, the Baltimore County Police Department
initiated an investigation of Matthew "following information
received about possible illegal drug <u>usage</u>."  Defs.' Ex. 1 (Jan.
19, 2005 Application and Aff. for Search and Seizure Warrant)
(emphasis added).  On December 3, 2004, police officers seized
and searched the garbage that had been set out in the alley
behind the Noels' home.  On January 14, 2005, police officers
conducted a second "trash rip."  These trash rips yielded
evidence consistent with the personal use of marijuana and
cocaine, but nothing to indicate that the home was being used for
distribution.  The police found 2.1 grams of marijuana stems and
seeds, some partially consumed marijuana cigarettes, and five
straws with trace amounts of cocaine.[1]

---

[1] In their motion, Defendants exaggerate somewhat the
evidence found in these trash rips.  They represent to the Court
that the rips netted "marijuana and cocaine, as well as assorted
drug paraphernalia such as zip-lock baggi<u>es</u>, razor blade<u>s</u> and
canisters."  Mot. at 4 (emphasis added).  The application for a
search warrant of the Noels' home, filed based upon the evidence
obtained from the trash rips, states that "<u>one</u> 2" x 2" empty zip
lock baggie, and <u>one</u> razor blade were recovered."  Defs' Ex. 1 at
10 (emphasis added).  While the application also states that
"[o]ne circular canister containing traces of a white powdery
residue" was recovered in the first trash rip, <u>id.</u>, the chemical

On January 19, 2005, Judge G. Darrell Russell of the District Court for Baltimore County signed a warrant for the search of the Noel home.  Upon receipt of the warrant, Defendant Robert Gibbons, a narcotics investigator, in consultation with Defendant Mark Crump of Baltimore County's Tactical Unit, determined that the warrant should be executed as a "no-knock" warrant.[2]  Defendant Michael Giddings, a Tactical Team Leader, developed a "Raid Plan" for the Noel home.

On January 21, 2005, at approximately 4:15 in the morning, Defendant Gibbons held a briefing with the Tactical Unit at the North Point Precinct.  He informed the members of the team of the underlying narcotics investigation and the criminal background of

---

analysis of that pull indicated that there were two canisters, but "No CDS detected" on those canisters.  Id. at 14.  While Defendants' embellishment might be minor, the Court sees it as part of a pattern of Defendants inflating the facts supporting the decision to stage the raid of the Noel home.

[2] A few months before Judge Russell approved the warrant at issue in this action, the Maryland Court of Appeals issued an opinion holding that Maryland state judges had no statutory authority to issue no-knock warrants.  Davis v. State, 859 A.2d 1112 (Md. 2004).  In the aftermath of the Davis decision, Baltimore County police officers were instructed to continue to include the justification for a no-knock entry in their applications for warrants, but were to refrain from asking the judge to specifically authorize that manner of execution. Instead, the decision as to whether a warrant would be executed no-knock was to be determined by the officers on the basis of the facts known to the officers at the time of entry.  The decision in Davis has since been abrogated by the Maryland General Assembly with the passage of legislation that confers on Maryland judges the authority to issue non-knock warrants.  Md. Code. Ann., Crim. Pro. § 1-203(a)(2)(ii).

the individuals that he believed would be in the home: Cheryl
Noel, Charles Noel, Jacob Noel, Matthew Noel, and Jason
Delciello.[3]   The team then proceeded by van to the Noel home.

At approximately 4:30 in the morning, officers used a
battering ram to break open the front door of the Noel home and
more than a dozen police officers swarmed into the house.   Three
seconds after the door was battered open, consistent with the
Raid Plan, the Tactical Team set off a "flash-bang" grenade, an
explosive device that creates a very bright flash and a very loud
noise and is employed to startle, confuse, and disorient the
individuals in the home.   Officers rushed to predetermined rooms
of the house, Defendants Artson and Defendant David Sweren
deploying to the second floor bedroom where Cheryl and Charles
Noel had been sleeping.   Defendants claim that, as the officers

---

[3] Mr. Delciello's relationship with the Noel family is not
apparent in the current record.   It appears that Gibbons believed
that Delciello would be in the home based upon "[r]esidency
papers in the name[] of Jason Delciello" found in the second
trash rip.   Defs.' Ex. 1 at 15.   The application does not explain
what those residency papers were.   Gibbons states that he relied
on Delciello's potential presence in the residence despite the
fact that he did no further investigation as to whether or why he
might be in the home.   Gibbons Dep. at 119-20.

As it turned out, Gibbons' briefing was not only inaccurate
about Jason Delciello's and Jacob Noel's potential presence in
the home, but Gibbons also failed to alert the team of an
individual who was likely to be present, Matthew Noel's
girlfriend, Sarah Betz.   Gibbons failed to mention Betz's
potential presence despite the fact that she had been staying
over at the Noel home several nights a week for some time and
Gibbons admitted that he had seen her car there "frequently."
Gibbons Dep. at 101.

were rushing into and through the home, Defendant Michael
Giddings was repeatedly shouting "police, search warrant,"
although there is some dispute as whether any announcement was
made by any of the officers.

Awakened by the sound of the door being beaten down and the
flash-bang device, and hearing the sound of what she believed to
be intruders stomping up the stairs, Cheryl Noel retrieved a
legally registered handgun that was either near her bed or under
her pillow.[4]  She was standing by her bed with the gun in both
hands, pointed slightly downward, when Defendant Artson kicked
open the door and entered the room, followed by Defendant Sweren.
Seeing Ms. Noel with the gun, Artson fired two shots at her as he
continued to enter the room.  Hit by the two shots, Ms. Noel went
down on the floor in a crouched position at the foot of the bed,
with her head at bed-level and her right arm and hand, still
holding the gun, resting on the corner of the bed.  Artson told
her several times to put down the gun and she released it.  The
gun, however, remained on the bed, inches from her hand.  Artson
ordered her several times to get away from the gun.  Although
Charles Noel states that his wife's eyes were closed and her head
leaning on her shoulder, Artson testified that she continued to

---

[4] Charles explains that Cheryl had placed the gun within her
reach on that particular night because she had gone to sleep
alone as he was working the midnight shift.  She was particularly
anxious because her son Matthew had been receiving threats from
an unknown individual or individuals.

look at him, "like she's trying to make a choice, make a
decision." Artson Dep. at 140. Artson stated that when he
observed her start to move her hand toward the gun, he fired a
third time into her chest.

After the third shot, Ms. Noel slumped forward and Defendant
Sweren retrieved the gun. Defendant Sweren then called for
paramedics who were stationed nearby and they arrived in minutes.
The paramedics pronounced Ms. Noel dead at the scene.

Meanwhile, officers secured the rest of the house. They
located Matthew Noel and Sarah Betz in the basement and arrested
them, along with Charles Noel. Police seized drugs and drug
paraphernalia that were found in various part of the home, as
well as some ammunition. Charles, Matthew and Sarah were charged
with possession of marijuana and, after a motion to suppress the
evidence seized in the raid was denied, Charles and Matthew pled
guilty to that charge. Charles was sentenced to one year in the
Baltimore County Detention Center, with all but 90 days
suspended; Matthew was given a 90 days suspended sentence and 100
hours of community service; and the charges against Sarah were
stetted.

Charles, Jacob (individually and as the personal
representative of Cheryl's estate), Matthew,[5] and Cheryl's

---

[5] It is not clear as to the capacity in which Matthew has
been made a plaintiff in this action. He is not named
specifically as a plaintiff, but the caption of the Complaint

mother, Ramona Schwieger, bring this action against individual
officers Artson, Sweren,[6] Giddings, Crump and Gibbons, and
against Baltimore County.  In addition to various counts under 42
U.S.C. § 1983, the Maryland Constitution, and Maryland common
law, Plaintiffs assert a separate claim against Baltimore County
under Monell v. Dep't of Social Services, 436 U.S. 658 (1978).
In their Monell claim, Plaintiffs assert that Baltimore County
failed to adequately train and supervise its police officers.
Plaintiffs also allege that Baltimore County "failed to develop
adequate policies to limit the use of paramilitary police units
to barricades, hostage situations, and terrorist attacks, rather
than execution of routine drug warrants."  Compl. ¶ 49.
Furthermore, Plaintiffs allege that if paramilitary units are to
be used for the execution of routine drug warrants, police should
have been better trained to protect citizens.

  After extensive discovery, Defendants have moved for summary
judgment as to all claims.  In their motion, Defendants have
addressed the potential liability of the individual defendants as
a unity, so the Court will do the same.  Plaintiffs have opposed
the motion, arguing that there are numerous genuine issues of

_____

indicates that the action is brought "To the Use of Matthew
Noel."

  [6] Defendants mention in their motion that Plaintiffs have
stated they intend to dismiss the claims against Sweren, but
Plaintiffs have yet to file any formal notification of that
intent.

material fact rendering summary judgment inappropriate.

## II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to summary judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For purposes of summary judgment, a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if, when applied to the substantive law, it affects the outcome of litigation. Anderson, 477 U.S. at 248.

A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When considering the motion, the court assumes that all of the non-moving party's evidence is worthy of belief and justifiable inferences are drawn in favor of the non-moving party. Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the party seeking summary judgment demonstrates that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation which demonstrates

that a triable issue of fact exists for trial.  <u>Celotex</u>, 477 U.S. at 324.  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  Instead, the evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party.  <u>Anderson</u>, 477 U.S. at 252.

## III. DISCUSSION

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds several aspects of Defendants' conduct potentially violative of Plaintiffs' constitutional rights.  First, the Court questions the reasonableness of the decision to execute the warrant as a no-knock warrant.  Second, while the first and second shot fired by Artson at Cheryl Noel may have been justified, genuine disputes of material fact as to the circumstances surrounding the firing of the third shot render summary judgment as to that issue inappropriate.

### A. No-knock Execution of the Warrant

Before addressing the merits of Plaintiffs' challenge to the decision to execute the search warrant in the manner in which they did, the Court must address Defendants' argument that Plaintiffs are collaterally estopped from re-litigating in this lawsuit the lawfulness of the no-knock entry.  Defendants contend that, in the criminal proceedings in the state court, Charles and Matthew unsuccessfully litigated this same issue in their attempt to suppress the evidence seized from their home.  Thus, according to Defendants, all of the Plaintiffs are now bound by Judge

Russell's evidentiary ruling in the criminal proceeding.

Courts have held that "[a] suppression hearing in an earlier state criminal trial collaterally estops the relitigation of the same issues in a § 1983 action <u>if the elements of collateral estoppel are met.</u>" <u>Gray v. Farley</u>, 13 F.3d 142 (4th Cir. 1993) (citing <u>Allen v. McCurry</u>, 449 U.S. 90, 105 (1980)) (emphasis added by this Court). The elements of collateral estoppel are as follows:

> (1) the issue or fact is identical to one previously litigated, (2) the issue or fact was actually resolved in the prior proceeding, (3) the issue or fact was critical and necessary to judgment in the prior proceeding, (4) the judgment in prior proceeding is final and valid, and (5) the party to be estopped had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

<u>In re: Microsoft Corp. Antitrust Litigation</u>, 355 F.3d 322, 326 (4th Cir. 2004).

There are several problems with the application of the doctrine of collateral estoppel in the case at bar. First, and foremost, as explained in the Supreme Court's recent decision, <u>Hudson v. Michigan</u>, 126 S. Ct. 2159, 2165 (2006), "the exclusionary rule is inapplicable" to situations in which there has been a violation of the knock-and-announce rule. Citing, <u>inter alia</u>, the alternative remedy of liability under § 1983 for this type of violation of the Fourth Amendment, Justice Scalia concluded that the "massive remedy" of the exclusion of evidence was unjustified. <u>Id.</u> at 2168. Thus, whether there had been a

violation of the knock-and-announce rule when the police stormed
the Noel home was simply not relevant to the motion to suppress
filed by Charles and Matthew.   Once it was determined that there
was probable cause for the issuance of the search warrant, which
Charles and Matthew conceded, the suppression motion had to be
denied.   While Judge Russell and the parties in the criminal
proceeding may have mistakenly believed that the reasonableness
of the no-knock execution of the warrant was determinative, under
the unambiguous teaching of <u>Hudson</u>, whether the Fourth Amendment
had been violated by the manner in which Defendants executed the
warrant was not "critical and necessary" to Judge Russell's
ruling.   Thus, Judge Russell's ruling cannot estop the litigation
of the issue here.[7]

---

[7] While Judge Russell did opine as to whether a no-knock
execution of the warrant was justified under the circumstances,
upon review of the transcript of the criminal proceedings, this
Court respectfully questions how clearly Judge Russell understood
precisely what those circumstances were.   <u>See</u> Defs.' Ex. 25
(transcript of July 14, 2006, suppression hearing, guilty plea
and sentencing).   Defendant Gibbons testified at the suppression
hearing that the items seized in the trash rips were consistent
with "essentially personal use."   Tr. at 28-29.   During the
sentencing phase of the proceeding, the state's attorney
described the evidence recovered from the home.   As to weapons,
he listed a .22 caliber pistol in the living room drawer, and
some ammunition, much of which would be consistent with someone
who hand packed shotgun shells for hunting purposes.   The drugs
that were recovered consisted of a small amount of marijuana in
an envelope and a baggie, some partially burned marijuana
cigarettes, some marijuana residue in pipes and ashtrays, and
some "unknown pills" from various places in the home.   As to drug
paraphernalia, he listed some pipes, a bong, some packs of
rolling papers, a small hand scale, a razor blade, and a "cut
straw" which, like the drugs recovered, are more consistent with
personal use than distribution.   And yet, Judge Russell describes
the evidence as a "[p]lethora of weapons, ammunitions, CDS and

At least one decision of which this Court is aware has recognized that a ruling on a suppression motion made under the mistaken belief that the exclusionary rule was applicable to unlawful no-knock searches should be given no binding effect on a subsequent civil action under § 1983. United States v. Brown, 189 Fed. Appx. 722 (10th Cir. 2006). In Brown, a criminal defendant urged that evidence seized from his residence be suppressed based upon the no-knock entry of the police. The district court, in a ruling issued prior to the Supreme Court's decision in Hudson, held that the no-knock warrant was justified to prevent destruction of evidence. The Tenth Circuit affirmed this decision but observed, "[b]ecause Hudson precludes application of the exclusionary rule to knock-and-announce violations," it was unnecessary to reach the issue of whether fear of the destruction of evidence justified an exemption from the knock-and-announce rule. Id. at 724. Consistent with that observation, the court then vacated those portions of the district court's order discussing whether the no-knock search violated the Fourth Amendment "to avoid complicated issues of res

---

paraphernalia," "which certainly justified their no-knock" and then questioned why Charles and Matthew were not charged with distribution. Tr. at 55. Elsewhere he opines that this was a "drug house," id. at 56, and "a house full of drugs and weapons." Id. at 67. When told that Charles was a long time employee of the Department of Defense, he expressed astonishment that he could get clearance for such a job given the homicide on his record, which leads this Court to suspect that Judge Russell did not have a clear understanding of the age or nature of Charles' conviction. See, infra at 17-18.

judicata that otherwise might result if [the defendant] chooses to bring a civil action in the future." Id. at 725.

As to Plaintiffs Jacob Noel, Ramona Schweiger, and Cheryl Noel's estate, Defendants' collateral estoppel argument also fails for an additional and obvious reason.  As stated above, the concept of collateral estoppel cannot apply unless the party against whom the earlier decision is asserted had a "full and fair opportunity" to litigate that issue in the earlier case. Certainly, these Plaintiffs did not have such an opportunity. While Defendants boldly assert in their reply memorandum that "under the doctrine of non-mutual collateral estoppel, the other plaintiffs are indeed bound by the ruling against Charles and Matthew on the motion to supress," Reply at 12 n.8, the case they cite, Rourke v Amchem Prods., Inc., 863 A.2d 926 (Md. 2004), offers no support for that proposition.  In fact, the Maryland Court of Appeals in Rourke stated categorically that "[u]nder no branch of collateral estoppel would an existing judgment have preclusive effect against a person who was not a party, or in privity with a party, in the action leading to the judgment." 863 A.2d at 933 n.5.  The doctrine of "non-mutual collateral estoppel" alluded to by Defendants, simply allows a non-party to a previous suit to use the judgment from that suit to prevent a losing party in the first suit from relitigating the issue.  Id.

Finding no estoppel, the Court turns to the merits of Plaintiffs' argument regarding the decision to enter the home in

13

the manner in which Defendants did.

The Fourth Amendment generally requires police officers entering a dwelling to first "knock and announce their identity and purpose before attempting forcible entry." Richards v. Wisconsin, 520 U.S. 385, 394 (1997).[8] This rule has been "embedded in Anglo-American law" for centuries, held in place by "the ancient adage that a man's house is his castle." Miller v. United States, 357 U.S. 301, 307 (1958); see also, Wilson v. Arkansas, 514 U.S. 927 (1995)(tracing the common law roots of the knock-and-announce rule).  The knock-and-announce rule serves important practical interests.  Bonner v. Anderson, 81 F.3d 472 (4th Cir. 1996).  In many cases, announcement reduces the potential for violence by informing occupants of the home that the person seeking entrance is not a burglar or an invader, but a police officer acting on lawful authority.  United States v. Gonzalez, 164 F. Supp. 2d 119 (D. Mass. 2001).  The rule also curbs the needless destruction of private property-if the occupant would have opened the door upon a simple request to do so, breaking it down is an unwarranted injury to a presumptively innocent person.  Id.  Finally, like all protections of privacy, it serves basic interests of human dignity.  "The brief interlude between announcement and entry with a warrant may be the

---

[8] The Fourth Amendment provides that persons have the right "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures . . . ." U.S. Const. amend IV.

opportunity that an individual has to pull on his clothes or get out of bed." Richards, 520 U.S. at 393 n. 5.

This knock-and-announce requirement, however, is not absolute and may be excused by exigent circumstances. See, e.g., Wilson, 514 U.S. at 934; United States v. Kennedy, 32 F.3d 876, 882 (4th Cir. 1994).  "In order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards, 540 U.S. at 394. "Whether exigent circumstances existed at the time of the entry, and whether the degree of the exigency was sufficient to justify the extent of the noncompliance, is determined by an analysis of the facts of each case." Kennedy, 32 F.3d at 882.  For a no-knock search to pass constitutional muster, officers must have some particularized basis for their suspicion.  See Richards, 520 U.S. at 394; United States v. Lalor, 996 F.2d 1578, 1584 (4th Cir. 1993).

As the particularized basis for their decision in this instance, Defendants point to three primary justifications. First, they argue that "both Charles and Matthew Noel had been involved in crimes of violence - murder in Charles' case, and assault with a handgun in Matthew's." Mot. at 20.  Second, Defendants point to the two handguns believed to be in the

15

residence.  <u>Id.</u>  Third, Defendants rely on the general
observation that "'the connection between illegal drug <u>operations</u>
and guns in our society is a tight one.'"  <u>Id.</u> (quoting <u>United</u>
<u>States v. Grogins</u>, 163 F.3d 795, 799 (4th Cir. 1998)) (emphasis
added by this Court).  Significantly, Defendants acknowledge that
concerns about the destruction of evidence did not factor into
their determination.  <u>See</u> Defs' Ex. 25 at 35 (testimony of
Defendant Gibbons, "Q: And so one of the decision-making factors
didn't include that there would be the possibility of destruction
of the evidence; isn't that correct?  A: That's correct.").[9]

The Court finds it dubious at best that Defendants could
conclude that Charles Noel's status as a "murderer" could lead
them to conclude that he would pose a danger to officers had they
simply knocked at the door of his home.  In Defendant Gibbons'
report justifying the raid, he listed as a factor: "Charles
Raymond Noel convicted of homicide and handgun violation
following his release from prison on 11/22/90."  Defs.' Ex. 5.
Gibbons testified that Charles' criminal background was one of

_____

[9] In his report prepared after the raid to justify the
decision to execute the warrant as a no-knock, Defendant Gibbons
offered several other generic reasons for the decision.  For
example, he points to the fact that the residence was an "end of
group row home" in a densely populated area, that there was a
school nearby, and that the drugs in question were "cocaine,
marihuana and pharmaceuticals."  Ex. 5.  These common factors
could be used to justify almost any warrant seeking drugs in a
home and courts have rejected this kind of blanket determination.
<u>See</u> <u>Richards</u>, 520 U.S. at 395 (rejecting blanket exception to
knock and announce in felony drug cases).

the "two key factors that he zeroed in on in utilizing the [SWAT] team."  Gibbons' Dep. at 120.

A minimal investigation, however, would have shown that Charles Noel was a Department of Defense employee who, at the time of the raid, had had no brush with law enforcement in more than 15 years.  The murder of which he was convicted was a second degree murder that took place in 1973, when Charles was in his teens.[10]  He was released after serving a five year sentence in 1978, not 1990 as asserted by Gibbons.  In the more than twenty-five years from his release to the time of the raid, Charles' only encounter with law enforcement was in 1990 when he was charged with transportation of a weapon.  He was not convicted of that charge, but received probation before judgment.

In <u>United States v. Singleton</u>, 441 F.3d 290 (4th Cir. 2006), police officers, like Defendants here, attempted to use old criminal charges and convictions to justify a no knock entry. Singleton's criminal history included "several arrests in the 1980s for firearm offenses, an arrest for second-degree murder in 1987, and then nothing until 2000, when Singleton was arrested for marijuana possession and importation and for driving with a revoked license."  <u>Singleton</u>, 441 F.3d at 293.  In response to the argument that this criminal history led police to reasonably

_____

[10] Charles, along with four other teenagers, harassed and attacked a homeless person in their neighborhood who later died of his injuries.  Charles pled guilty to a second-degree murder charges arising from that incident.

17

suspect that knocking and announcing would be met with violent

resistence, Judge Diana Motz concluded,

> [t]he addition of Singleton's criminal
> history does not decisively tip the balance
> toward forgoing the knock-and-announce
> requirement.  Singleton may have had a rough
> past, but his history of violence ended (as
> far as the police knew) in 1987, with his
> conviction for second-degree murder.  He then
> managed to avoid violating the law for
> fourteen years, until he again ran into
> trouble in 2000 - but even then he was only
> convicted of driving with a revoked license.
> Furthermore, the police had no contemporary
> evidence that Singleton owned a firearm . . .
> .  Given the lack of any contemporary
> evidence that Singleton might prove violent
> to police, it is unclear whether the police
> reasonably believed that knocking and
> announcing their presence would be dangerous.

Id., 441 F.3d at 294.

Any inference of a "violent propensity" from Charles Noel's

criminal history is even more attenuated than that in Singleton.

If Defendants were unaware of the nature and staleness of

Charles' criminal history, the question arises as to whether

Defendants conducted an adequate investigation.  If they were

aware of the staleness, and yet chose to ignore it in reaching

their conclusions as to Charles' violent propensity, it could be

questioned whether any of the other factors were considered in

good faith.

Although there is a lesser degree of difficulty with

Matthew's criminal history, Defendants appear to have overstated

the record here as well.  In the application for the warrant and

in Gibbons' January 21, 2005, report justifying the raid, it is

18

represented that Matthew was arrested on December 18, 2004, and charged with attempted first degree murder and a handgun violation.  Defs.' Ex. 1 at 13; Ex. 5.  Matthew's arrest arose out of an incident that occurred on the parking lot of a convenience store.  While on his way into the store, Matthew became involved in an exchange of words with several other individuals that escalated to a physical struggle.  In the course of that struggle, Matthew pulled out a gun, it went off, and a bullet hit one of the other individuals in the foot.  While Matthew was initially charged with attempted murder, the murder charge was superceded, well before the execution of the warrant, by an indictment charging Matthew with first degree assault and reckless endangerment.  See Pls.' Ex. 18.  Although Gibbons indicated that he had read the police report concerning the incident, Defendants either did not know or chose to ignore the fact that the charges were seriously reduced when they were offering justification for the no-knock entry.[11]

As to the potential presence of guns in the home, Defendants cite to the fact that Cheryl Noel had legally purchased a handgun in 1988 and that Jacob Noel had legally purchased one in 2004. The Court notes that, had Defendants done minimal investigation, they would have learned that Jacob had moved out of the home months previously and thus, his gun would not have been relevant.

---

[11] Gibbons would have also known from the police report that the gun involved in the incident was recovered by the police and, thus, no longer in Matthew's possession.

As to Cheryl's legally purchased handgun, courts have rejected
attempts to justify violations of the knock and announce
requirement solely based upon the presence of a gun in a home.

> If [that] view were correct, then the knock
> and announcement requirement would never
> apply in the search of anyone's home who
> legally owned a firearm.  This clearly was
> not and is not the law, and no reasonable
> officer could have believed it to be so.  We
> think a reasonable officer would have known
> that guns do not fire themselves, and that a
> justifiable fear for an officer's safety must
> include a belief, not simply that a gun may
> be located within a home, but that someone
> inside the home might be willing to use it.

Gould v. Davis, 165 F.3d 265, 272 (4th Cir. 1998).

As to Defendants' invocation of the "[tight] connection
between illegal drug operations and guns in our society," the
Court notes there is nothing in the record to indicate that there
was a drug "operation" in the Noel home.  The evidence seized in
the trash rips was wholly consistent with personal drug use and
Defendants have pointed to no evidence upon which they could have
relied to believe that Matthew or anyone else in the Noel home
was engaged in distribution.  The evidence here stands in sharp
contrast to the evidence in Grogins, the case relied upon by
Defendants.  In Grogins, the police entered a home without first
knocking and announcing based upon credible evidence that the
home was a residential "stash house" used by the defendant, a
notorious drug dealer, to supply his downtown retail locations.
163 F.3d at 796.  Defendants make no claim that the Noels' home
was a stash house, or anything of the sort, likely to be

protected with deadly weapons.

Based on the evidence, a jury could conclude that Defendants conducted scant investigation prior to deciding to storm the Noels' home.  They placed "dangerous" people in the home which a reasonable investigation would have determined would not be there, they seriously mischaracterized the dangerousness of the individuals that were in the home, and they seemingly ignored the potential presence of innocent, non-target individuals, whose presence a reasonable investigation would have predicted.

**B. The Third Shot**

Turning from the planning of the raid to the events that took place in the second floor bedroom, the Court finds that, while Defendant Artson's first two shots may have been justified, there is a genuine dispute of material fact as to whether the third shot was an unconstitutional use of excessive force.

Claims of excessive force against police officers are analyzed under the Fourth Amendment and its "reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 395 (1989).  "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.  Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001).  A police officer can use deadly force, as used here, when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others."  Tennessee v. Garner, 471 U.S. 1, 11

(1985).   Courts are cautioned that "the 'reasonableness' of a
particular use of force must be judged from the perspective of a
reasonable officer on the scene, rather than with the 20/20
vision of hindsight," making "allowance for the fact that police
officers are often forced to make split-second judgments in
circumstances that are tense, uncertain, and rapidly evolving."
Graham, 490 U.S. 396-97.   Courts are also instructed, however, to
evaluate whether the circumstances justifying the use of a
particular amount of force may have changed during the course of
an encounter.   A few days before this incident, the Fourth
Circuit released an opinion holding "that force justified at the
beginning of an encounter is not justified even seconds later if
the justification for the initial force has been eliminated."
Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005).

Defendant Artson has testified that after firing the first
two shots, he ordered Ms. Noel several times to drop the gun,
which she did, but her hand still stayed within inches of the
gun.   He states that he remained stationary, concerned that if he
attempted to retrieve the gun, she could pick it up and shoot
him.   He then explains, "she continues to look at me.   I'm giving
her commands, get away from the gun, get away from the gun.
She's looking at me like she's trying to make a choice, make a
decision.[12]   Then she goes back for the gun again so I fire one

_____

[12] Defendants inject in a footnote a callous and wholly
speculative suggestion that Ms. Noel may have been intentionally
provoking the police into shooting her.   They opine, "[t]his

more shot."  Artson Dep. at 138-40.  Unquestionably, under the
circumstances as Defendant Artson describes, the third shot would
have been justified.

Charles Noel, however, provides a very different account of
this phase of the encounter.  He testified that as his wife was
sitting or kneeling on the floor at the foot of the bed, "her
head was slumped over onto her left shoulder, and her eyes were
closed.  When she didn't respond, the shooter stepped forward,
leaned overtop of her, looked at her long enough to see her draw
a breath, and fired a third shot directly into the center of her
chest."  Charles Noel Dep. at 103-04.  While Mr. Noel's testimony
may seem less credible than Defendant Artson's,[13] on a motion for

_____

certainly may have been a "suicide by cop" incident, as the
police investigating this incident found a recent diary entry
written by Mrs. Noel which she concluded by stating that 'I just
want to go numb 'cause I can't stand it anymore.'" Reply at 7 n.4
(quoting Reply Ex. 5 (Jan. 2, 2005 diary entry)).  This New
Year's entry reflects a woman who, while troubled by personal and
family concerns has recommitted herself to going to the gym and
eating healthy and, in the sentence just above the sentence
quoted by Defendants, opines that "everything [is] for a reason."
For Defendants' counsel to project suicidal ideations into this
journal entry and then leap to a "suicide by cop" theory is
frankly offensive.

[13] Defendants argue that if Defendant Artson were as close
to Ms. Noel as Charles Noel indicated in his deposition, there
would have been "gunpowder stipling" on her body according to the
testimony of the Medical Examiner.  Reply at 8 (citing Dep. of
Dr. Ana Rubio at 61.  The Medical examiner's opinion on that
point was not definitive.  See Rubio's Dep. at 61 (testifying "I
would expect to see stippling if it was one or two feet, but that
is, is easy thing to try . . . a test can be done for this").
Regardless, while Mr. Noel may have been mistaken as to the
location of Artson in the room, that does not necessarily lead to

summary judgment, this Court must assume that all of Plaintiffs'
evidence is worthy of belief and must draw all inferences in
Plaintiffs' favor.  Matsushita Elec., 475 U.S. at 587.  Under the
circumstances as Charles Noel describes them, firing the third
shot would have been unreasonable.  A jury could also find that,
with immediate medical treatment, Ms. Noel could have survived
the first two shots had the third shot not been fired.[14]

## IV.  CONCLUSION

For the above stated reasons, the Court concludes that a
jury could find that Cheryl Noel's constitutional rights were
violated  by Defendants' decision to execute the warrant in the
manner in which they did, and by Defendant's Artson's firing of
the third shot.  Because Defendants rested their entitlement to
summary judgment as to all claims against all Defendants,

---

the conclusion that he was mistaken about Cheryl Noel's eyes
being closed before the third shot was fired.

[14] Dr. Michael Baden opined that the wounds on the left and
right sides of Ms. Noel's chest were "not immediately fatal but
needed medical attention."  Pls.' Ex. 21.  He opined that the
wound in mid chest was "immediately fatal even with medical
attention."  Id.  Defendants' counsel "surmised," that the wound
in the center of the chest was one of the first two shots, but he
acknowledges that he is "a lay person unfamiliar with forensic
science" and that the Medical Examiner was unable to verify his
theory.  Reply at 9 n.5 (citing Rubio Dep. at 62-64).  The Court
finds that there is more than sufficient evidence in the record
for the jury to conclude that the third shot was the fatal shot
to the center of her chest.  See Dep. of Richard Campbell at 50
(testifying that the third shot disturbed her clothing in the
"center of her chest"); Dep. of Charles Noel at 104 (testifying
that the third shot was fired "directly into the center of her
chest").

including the County, on the same arguments, <u>see</u> Mot. at 23-24,

the motion will be denied in its entirety.  A separate order

consistent with this memorandum will issue.


                                        /s/
                              _____
                              William M. Nickerson
                              Senior United States District Judge

Dated: September 6, 2007.